**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| RODRIGO LUIS DELGADO, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:15-CV-00360-CAN |
| | § | |
| MARIANA CECILIA LUIS OSUNA, | § | |
| | § | |
| Respondent. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On May 22, 2015, Petitioner, Rodrigo Luis Delgado, filed a Verified Petition Under Hague Convention for Return of Abducted Children [Dkt. 1] seeking the return of his seven-year-old and three-year-old sons, both minors ("J.A.L.O." and "D.A.L.O," respectively, and referred to collectively herein as the "children"), to Venezuela. On June 15, 2015, the Honorable United States District Judge Amos L. Mazzant ordered Respondent, Mariana Cecilia Luis Osuna, to appear before the Court on July 24, 2015, and show cause as to why the children should not be returned to Venezuela, accompanied by Petitioner, and why the relief requested in the Verified Petition should not be granted [Dkt. 6]. At the request of the Parties, the hearing was reset for August 14, 2015 [*see* docket entry made July 13, 2015]. On July 23, 2015, the Parties filed a Report of Rule 26(f) Planning Meeting [Dkt. 9], setting out the factual basis underlying the Parties' contentions, various agreements reached between the Parties for discovery deadlines, and notifying the Court that the Parties agreed to consent to the Magistrate Judge for the hearing and disposition of this matter. On August 14, 2015, the Parties executed a formal consent to the disposition of this case by the United States Magistrate Judge, and this case was referred to the undersigned for all further proceedings and entry of judgment [Dkts. 17, 18].

On August 12, 2015, Petitioner filed his Brief in Support of Verified Petition Under Hague Convention for Return of Abducted Children [Dkt. 10]. On August 13, 2015, Respondent also filed a trial brief in support of her defenses [Dkt. 11].

On August 14, 2015, the Court conducted a show cause hearing and bench trial on the merits of Petitioner's Verified Petition Under Hague Convention for Return of Abducted Children [Dkt. 1]. A Spanish interpreter, Mr. Guillermo Galindo, was present, and provided interpretive services throughout the proceedings. The Parties agreed to Mr. Galindo and to abide by his interpretation of the proceedings.[1] During the hearing, the Court received evidence and heard testimony from Petitioner and Respondent, as well as witnesses for Respondent (all teachers and/or professionals currently or previously employed at Frisco Independent School District ("Frisco ISD")), specifically Melissa Fletcher, Tammy Anderson, and Pam Graham. Both Petitioner and Respondent had full opportunity to present arguments, testimony, and/or evidence in support of their respective positions. At the conclusion of the hearing, the Court orally announced its ruling that Petitioner's Verified Petition Under Hague Convention for Return of Abducted Children [Dkt. 1] was **DENIED**, and that a written decision would be forthcoming.

### Findings of Fact

### I. The Parties' Dealings in Venezuela Prior to May 2014

Petitioner is a dual citizen of Spain and Venezuela, and is the forty-year-old biological father of the children in this case [Pet. Ex. 1 at 8; TR (Petitioner) at 43:12-20]. Respondent is also a citizen of Venezuela, and is the thirty-four-year-old biological mother of the children in this case [Pet. Ex. 1 at 5]. Petitioner and Respondent met in 2000 in Caracas, Venezuela, and were married two years later, on November 9, 2002, in Maracay, Venezuela [*Id*. at 6, 30, 60-65;

---

[1] Prior to the hearing, the Parties reached an agreement regarding the costs of the interpreter.

TR (Petitioner) at 3:13-17].   The Parties have an apartment in Maracay, where they resided together from 2008 until May of 2014 [Pet. Ex. 1 at 8-9, 31; TR (Petitioner) at 6:20-22, 7:13-18].[2]  In Venezuela, Petitioner is a physician specializing in urology, and Respondent was a stay-at-home mother [Pet. Ex. 1 at 8-9, 20-21].

J.A.L.O. was born in Maracay on July 17, 2008, and resided in Maracay in the family home, outside of short vacations and/or for treatment, until May of 2014 [Pet. Ex. 1 at 31, 51-54; TR (Petitioner) at 6:20-22].   J.A.L.O. is a dual citizen of Spain and Venezuela, and has been diagnosed a high-functioning autistic individual [Pet. Ex. 1 at 93-112; Pet. Ex. 8 at 26:18-27:2; TR (Petitioner) at 48:3-11; TR (Respondent) at 46:7-8, 63:12-14].   No party disputes this diagnosis.  J.A.L.O. also has a speech delay [Pet. Ex. 1 at 113-141; Pet. Ex. 8 at 28:18-22; TR (Petitioner) at 48:12-13].  J.A.L.O. is currently seven-years-old and has been enrolled in school in Frisco ISD since approximately June of 2014 [Pet. Ex. 8 at 55:7-15; TR (Respondent) at 51:5-9; Res. Ex. 4 at 1].

D.A.L.O. was born in Caracas on September 9, 2011, and resided in Maracay in the family home, outside of short vacations, until May of 2014 [Pet. Ex. 1 at 19, 31, 55-59; TR (Petitioner) at 7:13-18].   D.A.L.O. is also a dual citizen of Spain and Venezuela, and is currently three-years-old [TR (Respondent) at 4:7-8].

Both Parties testified that prior to the family's travel to the United States in May of 2014, Petitioner and Respondent frequently discussed the civil unrest, danger, and violence occurring in Venezuela, and discussed relocating their family to another country [TR (Petitioner) at 11:22-12:19, 21:16-22:11; TR (Respondent) at 5:20-6:9, 11:12-12:14; Pet. Ex. 8 at 7:14-9:6].  Petitioner and Respondent discussed several possibilities for their new country of residence,

---

[2] Other than limited time periods where Respondent resided in Caracas along with the Parties' son J.A.L.O. for purposes of seeking treatment for J.A.L.O.'s autism [TR (Respondent) at 65:1-5, 70:25-71:1].

including the United States, Spain, Panama, and Ecuador, among others [TR (Petitioner) at 60:1-61:16; TR (Respondent) at 5:22-6:1, 11:12-12:14]. Petitioner and Respondent each reported being fearful for their family, especially the children, after the family was robbed in a hotel room in July of 2013, while they slept [TR (Petitioner) at 47:7-13; TR (Respondent) at 4:23-25, 5:6-19; Pet. Ex. 8 at 7:14-9:6]. Moreover, Respondent testified that her family, specifically her uncle and father, had been involved in a military coup to overthrow the current Venezuelan government, and, as a result, she and other members of her family had been threatened by the government, and that she believed her children had also been threatened [TR (Petitioner) at 45:21-46:7; TR (Respondent) at 6:10-8:3, 7:8-18]. Specifically, Respondent testified that she believed her children were threatened on March 4, 2014, when she was asked to pass a message to her uncle and father to "stop messing with the government" [TR (Respondent) at 10:6-11:11]. At the conclusion of the conversation, the men who threatened her said, "Okay, you have a beautiful blondies [children], then take care." [TR (Respondent) at 10:16-22].

Both Parties testified that in September of 2013, after they were robbed, they planned a trip to the United States to occur on May 14, 2014, to allow Petitioner to attend the Annual Congress of Urology and to take their children to Sea World and other amusement parks [TR (Petitioner) at 22:12-14]. The family obtained six-month tourist visas for the visit [TR (Petitioner) at 55:9-10]. Originally, the Parties purchased round-trip tickets for all four family members departing Venezuela and arriving in Miami on May 14, 2014, and departing Miami to return to Venezuela on May 26, 2014 [Pet. Ex. 1 at 66-72]. Following the March threat, one-way tickets were also purchased (sometime between March and May of 2014), for Respondent and both children to travel to Respondent's sister's home in Frisco, Texas, for an undetermined period of time [TR (Petitioner) at 10:7-14, 53:2-10, 79:9-12; TR (Respondent) at

17:20-18:5]. No return tickets were ever purchased for Respondent and the children [*Id.*]. The Parties intended upon arrival in the United States to enroll J.A.L.O. in summer school in Frisco, Texas [*Id.*; TR (Respondent) at 19:17-20:2, 50:8-51:9]. In March of 2014, also after the threats were made, Respondent withdrew J.A.L.O. from school, with Petitioner's knowledge and approval [TR (Respondent) at 13:14-14:6]. Respondent sent all of J.A.L.O's paperwork to the school in Frisco in April of 2014, to prepare for his enrollment there upon their arrival in the United States in May [TR (Respondent) at 13:4-13]. Petitioner testified that he was aware that J.A.L.O. would be enrolled in summer school [TR (Petitioner) at 82:20-83:13]. Respondent testified that the family planned to visit the United States with the intent to seek political asylum [*Id.*; TR (Petitioner) at 11:1-21; TR (Respondent) at 12:15-20, 15:10-15, 45:2-15; Pet. Ex. 2 at 1]. Petitioner testified that he never intended for his family to move to the United States permanently [TR (Petitioner) at 10:2-6, 12:20-13:6; *but see* TR (Respondent) at 47:3-19, 72:6-21].

Before arriving in the United States, Respondent packed as many of their belongings as could fit inside two (2) suitcases per person, resulting in a total of eight (8) suitcases, which was the maximum amount of luggage allowed by the airline before an additional fee would be incurred [TR (Petitioner) at 8:3-5; TR (Respondent) at 14:7-10]. In addition, she brought all of her and the children's important documents, such as birth certificates, Petitioner and Respondent's marriage license, all medical and school records for J.A.L.O., and her college certificates [TR (Respondent) at 14:11-21]. Respondent also testified that she and Petitioner went to Respondent's mother's house to pick out jewelry to bring with her to the United States [TR (Respondent) at 15:1-9]. Respondent testified that she recalled saying to Petitioner that they were "looking just like Jews – Jews trying to run out from Germany. We are taking all the

jewels and all the gold that we can collect and put inside to go out from Venezuela" [*Id.*]. Respondent testified that Petitioner was aware and even went with her to pick out the jewelry to take to the United States [*Id.*]. In addition, Petitioner, prior to the trip, established a bank account at Bank of America in Frisco, Texas, and deposited money which Respondent testified was intended to support her and the children [Pet. Ex. 7; TR (Petitioner) at 71:7-23; TR (Respondent) at 37:1-3]. Petitioner also later sold one of the family's two vehicles in Venezuela to pay some outstanding loans and send money to Respondent and the children in the United States [TR (Petitioner) at 9:10-22; TR (Respondent) at 37:21-38:24]. However, Petitioner testified that they left behind ninety percent of their personal belongings in Venezuela, they did not sell their apartment, Petitioner did not attempt to sell his medical practice, and took only the clothing and other items that could fit in the maximum suitcases allowed by the airline [TR (Petitioner) at 8:9-9:4, 9:8-14, 9:23-10:1].

## II.    *The Parties' Dealings After the May 2014 Visit/Relocation to the United States*

On May 14, 2014, Petitioner, Respondent, and their two children traveled to Miami, Florida [TR (Petitioner) at 7:23-8:2, 10:7-14; TR (Respondent) at 17:14-17; Pet. Ex. 1 at 66-72].[3] During the May 14, 2014 visit/relocation, Petitioner and Respondent met with an immigration consultant, Maritza Cifuentes (referred to in the transcript as Marisa Sufuentes), who assisted with the translation of documents and aided in the preparation of applications for political asylum for Respondent and the children [TR (Petitioner) at 11:6-15; TR (Respondent) at 16:1-25; Pet. Ex. 8 at 11:17-24]. As early as April of 2014, Petitioner was aware of this intended meeting and agreed to attend [*Id.*]. During that meeting, the Parties testified that they learned that to continue practicing medicine in the United States as a urologist, Petitioner would have to

---

[3] Petitioner ultimately never attended the urology conference, which he testified prompted the trip. Petitioner testified he failed to attend because he was feeling unwell on those days [TR (Petitioner) at 52:5-12; TR (Respondent) at 17:18-19].

undergo an additional fourteen (14) years of medical school and/or training [TR (Petitioner) at 11:19-21, 13:25-14:16; TR (Respondent) at 45:19-46:4]. Moreover, the Parties learned that if their application for political asylum was denied, they would not be able to continue traveling to the United States for recreational purposes using tourist visas [TR (Respondent) at 16:20-25]. Accordingly, Petitioner made the decision to return to Venezuela to continue practicing medicine and not to pursue asylum in the United States [Pet. Ex. 1 at 69; TR (Respondent) at 17:1-4, 18:21-19:7, 45:2-10; Pet. Ex. 2].

Petitioner generally testified that he intended Respondent and the children to return to Venezuela sometime after the expiration of the six-month visas, but he had no specific time frame in mind [TR (Petitioner) at 53:8-10, 61:14-16]. There was no end date on Respondent and the children's visit in Frisco when the family arrived in the United States. Respondent testified that she did not intend to ever return to Venezuela, but that she and Petitioner had discussed being reunited as a family in Spain in the future if Petitioner sought and was able to find a job there [Pet. Ex. 2; TR (Respondent) at 42:4-24, 45:13-46:4]. Petitioner also stated that he was aware of the asylum application and allowed Respondent to continue seeking asylum with the children, but did not seek asylum for himself because of the implications for his medical career [TR (Petitioner) at 11:16-18, 54:24-55:4, 58:20-59:1]. Petitioner reiterated that he did not consent to, and never had an intent for, Respondent and the children to live in the United States without him permanently [TR (Petitioner) at 10:2-6, 12:20-24; *but see* TR (Respondent) at 47:7-24].

On May 25, 2014, Respondent and the children, using one-way tickets, flew to Texas [TR (Petitioner) at 53:2-10; TR (Respondent) at 17:20-18:5]. Again, Petitioner acknowledged that there was no particular end date in mind for the return of Respondent and the children to

Venezuela from Texas [TR (Petitioner) at 53:8-10]. Petitioner returned to Venezuela on May 26, 2014, and had not returned to the United States until the date of hearing [TR (Petitioner) at 57:20-23].

Throughout the spring and summer of 2014, Respondent continued residing with the children in Frisco with her sister, and J.A.L.O. was enrolled in school in Frisco [TR (Respondent) at 18:1-3, 26:21-23]. On June 30, 2014, Petitioner told Respondent that he wanted both children to learn English within one year of being in the United States without losing their Spanish, and that he was proud of their progress [TR (Respondent) at 24:8-9, 25:1-16]. On July 9, 2014, Petitioner signed a power of attorney giving Respondent the authority to make decisions regarding medical, educational, and other care of the children while in the United States [Pet. Ex. 4; TR (Petitioner) at 23:17-21, 24:12-13, 67:4-68:14; TR (Respondent) at 18:21-19:16]. The Parties' testimony diverged regarding the reason for execution of the power of attorney. Petitioner testified that the power of attorney was merely intended to give Respondent some authority to make decisions regarding the children, but that it expired upon his return to the United States and contains a provision stating that he did not give up his parental or custody rights by signing the power of attorney [Pet. Ex. 4; TR (Petitioner) at 24:12-25:1]. Respondent testified that Petitioner signed the power of attorney solely so that Respondent could pursue asylum applications for the children [TR (Respondent) at 19:8-12]. Respondent testified that there was no other reason for the power of attorney to exist, and that Petitioner was aware of this fact [*Id.*]. Both Parties agreed that the power of attorney did not divest or otherwise effect Petitioner's custody rights in any way [TR (Petitioner) at 23:17-26:11; TR (Respondent) at 19:13-16]. Respondent testified that Petitioner was supportive of her and the children remaining in the United States, that he spoke to his children frequently, and initially sent the family money

to support them while they were in the United States [TR (Respondent) at 23:11-13, 25:15-16, 35:4-11, 78:12-22]. Whatever the reason for its execution, Petitioner unequivocally testified that he did not want the children to return to Venezuela prior to September of 2014, because of the civil unrest that was occurring there [TR (Petitioner) at 47:14-23, 53:22-24, 63:11-64:10; TR (Respondent) at 78:12-22]. In the fall of 2014, Petitioner packed and sent, through a family member, some heavier clothes to Respondent and the children for their use during winter [TR (Petitioner) at 45:9-18; TR (Respondent) at 43:18-44:8]. Respondent testified that even as late as October of 2014, Petitioner continued to be aware of the asylum application and continued to support her in pursuing asylum; specifically, she was required to fly to Florida to be fingerprinted and Respondent paid for the flights for her and the children using money that Petitioner gave to her with his knowledge that she was going to use it for that purpose [TR (Respondent) at 20:13-25]. Petitioner provided approximately $500 a month to Respondent and the children until December of 2014, when he ceased making these payments and made deposits instead in her Venezuelan account in the amount of 6,000 Bolivar (which amounts to approximately $9 with the exchange rate) [TR (Respondent) at 35:4-36:13].

Petitioner testified that as of September of 2014, the political situation in Venezuela was improving and he asked Respondent to return to Venezuela with the children at that time, and Respondent refused [TR (Petitioner) at 38:24-39:8]. Petitioner stated that at that time, the relationship between Petitioner and Respondent started to disintegrate, and he filed for divorce in January of 2015 [TR (Petitioner) at 53:11-24], and subsequently filed this Petition in May of 2015 [Dkt. 1]. The Parties are still legally married, and Petitioner continues to be involved in the children's lives [TR (Respondent) at 33:16-24]. He speaks to them frequently using FaceTime and other electronic means of communication, and has been aware of their location

since their entry to the United States [TR (Petitioner) at 38:11-15; TR (Respondent) at 34:23-35:3, 48:22-23].

Respondent obtained a work permit and currently has a job in Frisco at an international shipping company, Shweebo, where she plans to remain employed, as she is eligible for a promotion and raise three (3) months from the date of her employment [TR (Respondent) at 21:17-22:19]. The children are enrolled in school, an in-home daycare program, summer school, and swimming lessons [TR (Respondent) at 26:16-20, 30:3-8, 31:10-12, 32:5-17]. Respondent testified that her expenses meet or exceed her income, but she anticipated receiving financial help from her family [TR (Respondent) at 61:4-62:15]. Each of the witnesses from Frisco ISD testified that J.A.L.O. was diagnosed a high-functioning autistic individual in Venezuela, and had several behavioral and learning difficulties [TR (Respondent) at 30:9-24, 33:6-15, 63:12-14; Res. Ex. 2; Res. Ex.3; Res. Ex. 4]. With encouragement and instruction throughout the past year at Frisco I.S.D., J.A.L.O. has begun to learn quickly and exhibit some behavior management techniques [Res. Exs. 2-4]. J.A.L.O.'s teachers testified that he is a wonderful child who has adjusted to his new environment well, and that a move back to Venezuela could set him back.

### III.     *Credibility of the Witnesses*

It is important to note that in making its findings of fact, some of the Court's findings involved facts about which the Parties agree. Other facts, however, are the subject of disagreement, including, of course, those facts most crucial to the resolution of this dispute. Thus, the Court was required to make certain findings regarding the credibility of the witnesses, and perhaps most importantly of Petitioner and Respondent. *See Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004) (stating that the district court must make certain factual and credibility determinations in its decision, which will not be disturbed by the appellate

court unless "a review of the evidence leaves us with 'the definite and firm conviction that a mistake has been made'"). Broadly speaking, the Court finds that both Petitioner and Respondent, and those who testified on Respondent's behalf, were generally credible.[4] Many of the facts were alleged by both Parties, and the testimony of the Parties in many regards corroborated the other. However, there are some areas in which the testimony of Petitioner and Respondent diverged greatly from each other, and the Court weighed such testimony and analyzed credibility in such instances as it should. Against this backdrop, the Court now turns to its analysis under the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter the "Convention"), and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 (West), *et seq.* (hereinafter "ICARA").

*Conclusions of Law*

### I. General Principles

Petitioner brought this action for the return of J.A.L.O. and D.A.L.O. under the provisions set forth in the Convention, as implemented through ICARA, which entitles a person whose children have been wrongfully removed to, or wrongfully retained in, the United States, to petition a federal court to order the children returned. 22 U.S.C. § 9001(a)(4). "The Convention has two primary 'objects': (1) 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and' (2) 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Larbie v. Larbie*, 690 F.3d 295, 306 (5th Cir. 2012) (citing CONVENTION, art. 1). This essentially means that under the Convention, a "wrongfully removed" child "is returned to his or her home country; the return order is not a determination as to the permanent legal or physical custody of

---

[4] The Court finds that the testimony offered by Respondent's witnesses from Frisco ISD was credible, albeit limited in scope to the issue of J.A.L.O.'s diagnosis of autism and the psychological implications of removing him from his current environment and returning him to Venezuela.

the child." *Sanchez v. R.G.L.,* No. 12-50783, 2014 WL 3798186, at \*4 (5th Cir. Aug. 1, 2014) (citing *Abbott v. Abbott*, 560 U.S. 1, 3-4 (2010)). "By focusing on the child's return, the Convention seeks to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Id.* (citing *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000)).

In a case falling under the Convention, a petitioner must establish by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Convention. 22 U.S.C. § 9003(e)(1); *De Vasconcelos v. De Paula Batista*, No. 4:10-cv-628, 2011 WL 806096, at \*1 (E.D. Tex. March 1, 2011). In order to show wrongful removal and/or retention here, Petitioner must prove that (1) the children were "habitual residents" of Venezuela at the time of removal; (2) the removal was in breach of Petitioner's custody rights under the law of Venezuela; and (3) Petitioner had been exercising those rights at the time of removal. *De Vasconcelos*, 2011 WL 806096, at \*1 (citing *Edoho v. Edoho*, No. H-10-1881, 2010 WL 3257480, at \*4 (S.D. Tex., Aug. 17, 2010); *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 841 (S.D. Tex. 2006)).

Even if a court finds that a child was wrongfully removed, however, a child may not be returned if one of many exceptions is established. *Id.* at \*2. The burden shifts to Respondent to establish by a preponderance of the evidence one of the following exceptions: (1) that the proceeding was commenced more than one year after the removal of the children and the children have become "well-settled" in their new environment; (2) that Petitioner was not actually exercising the custody rights at the time of removal or retention, or consented to or subsequently acquiesced to the removal or retention; or (3) that the children object to being returned and have attained an age and degree of maturity at which it is appropriate to take

account of their views. CONVENTION, arts. 12 & 13; 22 U.S.C. § 9003(e)(2)(B). In addition to these exceptions, a respondent can avoid return of the child by showing the following exceptions by clear and convincing evidence: (1) that there is a grave risk that the return of the children would expose them to physical or psychological harm, or otherwise place them in an intolerable situation, or (2) that the return of the children would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms. CONVENTION, arts. 13(b) & 20; 22 U.S.C. § 9003(e)(2)(A). "Courts should narrowly interpret a defense and allow it to prevent the child[ren]'s return only in meritorious cases when the person opposing return has met the burden of proof." *Van Driessche*, 466 F. Supp. 2d at 846. Respondent here asserts the following defenses: (1) the "well-settled" children defense; (2) the consent and/or acquiescence defense; (3) the grave risk that the return of the children would expose them to physical and/or psychological harm defense; and (4) that the return of the children would not be permitted by fundamental principles of the requested state relating to the protection of human rights and fundamental freedoms (referred to herein as the "public policy" defense).

## II. *Wrongful Removal and/or Retention*

Pursuant to the Convention and ICARA, Petitioner bears the initial burden of establishing by a preponderance of the evidence that J.A.L.O. and D.A.L.O. have been "wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). The Convention provides that a child's removal or retention is wrongful if "it is in breach of rights of custody attributed to a person…, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention," and if the Petitioner was actually exercising those rights at that time. CONVENTION, art. 3. Accordingly, Petitioner can

sustain his burden if he proves that: (1) the children were habitual residents of Venezuela at the time of the wrongful removal and/or retention; (2) the wrongful removal and/or retention was in breach of his custody rights under the law of Venezuela; and (3) he had been exercising those rights at the time of the wrongful removal and/or retention. *Edoho*, 2010 WL 3257480, at *4; *Van Driessche*, 466 F. Supp. 2d at 841.

### A. Existence and Exercise of Custody Rights

The Court briefly turns to whether the removal and/or retention was in breach of Petitioner's custody rights and whether he had been exercising those rights at the time of the removal and/or retention. *Edoho*, 2010 WL 3257480 at *4; *Van Driessche*, 466 F. Supp. 2d at 841. The Convention's provisions define "rights of custody" as those rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence. CONVENTION, art. 5. Here, there was no formal custody arrangement between Petitioner and Respondent as to the children at the time of the alleged removal or retention. When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention. *Sealed Appellant*, 394 F.3d at 343. Petitioner argued that Venezuelan law should be applied. Respondent at no time during the proceedings meaningfully disputed Petitioner's rights of custody and/or that he was exercising them at the time of removal and/or retention. Indeed, while both Parties agreed that the power of attorney signed by Petitioner gave Respondent some authority to make decisions regarding the children, it was not meant to, and did not, divest or effect Petitioner's parental or custody rights.[5] Accordingly, the Court concludes that Petitioner has satisfied his burden to show that he had custody rights over his children.

[5] [Pet. Ex. 4; TR (Petitioner) at 23:17-26:11, 24:12-25:1; TR (Respondent) at 19:13-16].

The Court similarly finds he was exercising such rights. To determine whether a party is exercising custody rights, courts have interpreted "exercise" broadly. *Sealed Appellant*, 394 F.3d at 344. "The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id*. at 344-45 (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996)). Petitioner cannot fail to exercise his custody rights "short of acts that constitute clear and unequivocal abandonment of the child." *Id*. at 345. Until May 25, 2014, the children continuously resided together with Petitioner and Respondent. Petitioner was always apprised of the location of Respondent and the children, and has kept in communication with them via phone, FaceTime, and other electronic communication throughout their time in the United States.[6] Petitioner also sent money to support his children, and provided clothing and other items for their well-being.[7] Petitioner appears to be a loving and caring father, has not exhibited conduct that would constitute abandonment of his children, was clearly exercising his custody rights at the time of the removal and/or retention, and continues to exercise them to this day.

## B. Habitual Residence

The Court must also determine whether J.A.L.O. and D.A.L.O. were habitual residents of Venezuela at the time of the wrongful removal and/or retention in the United States. "The inquiry into a child's habitual residence is not formulaic; rather, it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Larbie*, 690 F.3d at 310. The term "habitual residence" is not defined by the Convention; "however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions

---

[6] [TR (Petitioner) at 38:11-15; TR (Respondent) at 34:23-35:3, 48:22-23].
[7] [TR (Respondent) at 35:4-36:13].

of its parents, who usually effect the removal or retention giving rise to a Convention petition."

*Berezowsky v. Ojeda*, 765 F.3d 456, 466 (5th Cir. 2014) (citing *Larbie*, 690 F.3d at 310).  The

Fifth Circuit, like the majority of circuits, has "adopted an approach that begins with the parents'

shared intent or settled purpose regarding their child's residence."  *Id*. (citing *Larbie*, 690 F.3d at

310; *Nicolson v. Pappalardo*, 605 F.3d 100, n.2 (1st Cir. 2010)).  This approach is intended to

give greater weight to the parents' subjective intentions relative to the child's age, given that in

some cases, including the case at hand, the children are so young that they cannot possibly

determine the issue of residency for themselves.  *Id*.

> In such cases, the threshold test is whether both parents intended for the child to
> abandon the [habitual residence] left behind.  Absent shared intent, prior habitual
> residence should be deemed supplanted only where the objective facts point
> unequivocally to this conclusion.  Notably, when the child's initial move from an
> established habitual residence was clearly intended to be for a specific, limited
> duration[,] … most courts will find no change in habitual residence.  Mere
> retention in another country and "private reservations" or intentions that are made
> "manifest and definitive" only after the child has left his country of origin are
> generally insufficient to establish intent to change a child's habitual residence.

*Berezowsky*, 765 F.3d at 466 (citing *Larbie*, 690 F.3d at 310-11).

Moreover, "[t]he mere fact that the parents have consented for the child to move to a new

country does not prove that they share the necessary intent to make that new location the child's

habitual residence."  *Id*. at 467.  The Fifth Circuit has held in some instances that parents have

not established a new habitual residence despite a significant amount of time in a new country.

*See id.* (citing *Mozes v. Mozes*, 239 F.3d 1067, 1083 (9th Cir. 2001)).  Context is the key to the

concept of habitual residence.  *Id*.  "Being habitually resident in a place must mean that you are,

in some sense, 'settled' there," but it need not mean that's where you plan to permanently reside,

nor can it be limited to persons who settle in an area for a particular motive.  *Berezowsky*, 765

F.3d at 467-68 (quoting *Mozes*, 239 F.3d at 1074).  "[T]he difficult cases arise when the persons

entitled to fix the child's residence do not agree on where it has been fixed." *Id.* at 468 (citing *Ruiz v. Tenorio*, 392 F.3d 1247, 1253 (11th Cir. 2004)). In these situations, the Court's task is "usually to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed." *Id.* (citations omitted).

In *Mozes*, both parents were Israeli citizens, and the father consented for the mother and children to "remain in the United States for fifteen months, though they disagree as to what understanding existed beyond that." 239 F.3d at 1069. The mother and children then came to Beverly Hills, where she leased a home, purchased automobiles, and enrolled the children in school. *Id.* The father remained in Israel, but paid for the house and automobiles, and stayed with them at the house during his visits to Los Angeles. *Id.* The Ninth Circuit found therein that the "habitual residence" question arises in three broad categories of cases. *Id.* at 1076. "On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move." *Id.* Often this occurs when both parents and the children translocate together under circumstances suggesting that they intend to make their home in the new country. *Id.* at 1076-77. "On the other side are cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period." *Id.* at 1077. The third type of cases are in between, where the petitioning parent had earlier consented to let the children stay abroad for some period of ambiguous duration. *Id.* Depending on the circumstances, a court may be able to determine that despite the lack of perfect consensus, the parents had a settled intent that the stay last indefinitely, or that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred. *Id.* The third category described in *Mozes* is present here,

where the petitioning parent consented to a travel period of ambiguous duration, and the Court must determine the Parties' settled intent, if any.

In *Berezowsky*, the Fifth Circuit, applying the reasoning from *Mozes* and *Larbie,* has found that "[a] shared parental intent requires that the parents actually *share* or jointly develop the intention… the parents must reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together." *Id*. (citing *Larbie*, 690 F.3d at 310; *Mozes*, 239 F.3d at 1081) (emphasis in original).  Until May 14, 2014, it is undisputed that the children were habitual residents of Venezuela.[8]  However, the Court finds that in May of 2014, Petitioner and Respondent had a shared intent to "abandon the [habitual residence] left behind," which is the threshold inquiry set forth by the Fifth Circuit in *Larbie*.  690 F.3d at 310-11.  The evidence clearly reflects that Petitioner and Respondent (and their two children), were robbed in a hotel room in 2013, Respondent was (and Respondent alleges the children were also) threatened by purported government officials in 2014, and Venezuela, generally, experienced escalating political protests and violence which peaked in early 2014.[9]  During this time of turmoil, Petitioner and Respondent mutually agreed to leave Venezuela with their children.[10] The Parties testified that the plan was to leave Venezuela on May 14, 2014, and travel to the United States for vacation with six-month tourist visas.[11]  Upon arrival in the United States, Petitioner and Respondent would seek political asylum for themselves and the children, while residing in the United States with the children.[12]  After arriving in the United States and meeting with Ms. Cifuentes, the plan was slightly altered by Petitioner and Respondent; however, the intent was

---

[8] [Pet. Ex. 1 at 19, 31, 51-59; TR (Petitioner) at 6:20-22, 7:13-18].

[9] [TR (Petitioner) at 21:16-24; TR (Respondent) at 5:20-6:1, 10:6-22; Pet. Ex. 8 at 7:14-9:6].

[10] [TR (Petitioner) at 11:1-12:19, 21:16-22:11; TR (Respondent) at 5:20-6:9, 11:12-12:20, 15:10-15, 45:2-15; Pet. Ex. 2 at 1; Pet. Ex. 8 at 7:14-9:6].

[11] [TR (Petitioner at 11:1-9; TR (Respondent) at 12:15-20, 15:10-15, 45:2-15].

[12] [*Id*.].

for Respondent to continue to seek political asylum for herself and the children, while Petitioner returned to Venezuela to seek employment opportunities elsewhere, for example, in Spain, Panama, or Ecuador.[13] The Parties testified that they were considering other countries, but had no intent to return to Venezuela. Thus, Petitioner and Respondent shared an intent to abandon Venezuela, the habitual residence of the children, and there was no intent to return. There was no date scheduled for a return to Venezuela by Respondent or the children.[14] In furtherance of this intent, Petitioner and Respondent agreed that J.A.L.O. should be enrolled in school in Frisco, Texas, agreed that D.A.L.O. should participate in certain activities, and Petitioner continued to support Respondent and the children by sending them additional clothing items and financial support in the United States.[15] It is clear that at some point the shared intent of the parents diverged, and they are currently no longer in agreement; however, "the court's task is usually to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed." *Berezowsky*, 765 F.3d at 468. The Court finds that the last shared intent of Petitioner and Respondent regarding their children's future was that they would leave their habitual residence, Venezuela, and would not return.

Moreover, the conduct of the Parties, both prior to the trip/relocation to the United States and after, is particularly telling, and weighs in favor of a finding that Venezuela was relinquished as the children's habitual residence. For instance, Respondent packed eight (8) suitcases for four (4) individuals, including two (2) young children, to take to the United States, which is indicative of the length of stay they were planning to undertake.[16] Further, Respondent, with Petitioner's assistance and knowledge, selected jewelry to take with her from her mother's home

---

[13] [TR (Petitioner) at 11:19-21, 13:25-14:16; TR (Respondent) at 16:20-25, 17:1-4, 18:21-19:7, 45:2-10, 42:4-24, 45:2-15, 45:19-46:4; Pet. Ex. 1 at 69; Pet. Ex. 2].
[14] [TR (Petitioner) at 10:7-14, 53:2-10, 79:9-12; TR (Respondent) at 17:20-18:5].
[15] [TR (Petitioner) at 45:9-18; TR (Respondent) at 13:14-14:6, 19:17-20:2, 43:18-44:8, 50:8-51:9].
[16] [TR (Petitioner) at 8:3-5; TR (Respondent) at 14:7-10].

stating "we are taking all the jewels and all the gold that we can collect and put inside to go out from Venezuela," and brought all important documents with her to the United States.[17] Petitioner, acknowledging that the family no longer needed two vehicles, sold one car and established a bank account in the United States for his family's support.[18] *See Berezowsky*, 765 F.3d at 472 (holding shared intent can be indicated by "selling the family's home or cars, for example, may indicate the intention to make a more permanent move."). Petitioner and Respondent agreed to withdraw J.A.L.O. from school in Venezuela and enroll him in school in Frisco, Texas, sent paperwork in advance of their travel, and agreed to enroll D.A.L.O. in an in-home daycare in Frisco, Texas.[19] *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 293-98 (3d Cir. 2006) (finding the child's habitual residence was in the United States because both parents agreed the child should enroll in school); *see also Munoz v. Ramirez*, 923 F. Supp. 2d 931, 948 (W.D. Tex. 2013) (concluding the shared intent was for the child to return to the habitual residence of Mexico because the petitioner enrolled the child in school in Mexico and the respondent enrolled the child in school in the United States). There is no evidence that either Petitioner or Respondent expected the trip/relocation to the United States to be of a temporary or limited duration.

Accordingly, the last shared or jointly developed intent of the Parties was to abandon Venezuela, the habitual residence of the children, and establish a habitual residence elsewhere. The Court is mindful that "the mere fact that the parents have consented for the child to move to a new country does not prove that they share the necessary intent to make that new location the child's habitual residence," and that a new location may not be established despite "a significant

---

[17] [TR (Respondent) at 14:11-21, 15:1-9].

[18] [TR (Petitioner) at 9:10-22; TR (Respondent) at 37:1-3, 37:21-38:24, 39:5-22].

[19] [TR (Respondent) at 13:4-13, 13:14-14:6, 19:17-20:2, 50:8-51:9].

amount of time in a new country." *Berezowsky*, 765 F.3d at 467.[20]  However, the evidence in this case clearly indicates that the Parties shared the intent to abandon Venezuela as the habitual residence of the children.

Based on this finding, the Petitioner has failed to meet his burden to establish by a preponderance of the evidence that the habitual residence of the children was Venezuela, and, thus, failed to demonstrate that the children were wrongfully removed and/or retained in the United States.[21]  Notwithstanding, the Court will consider Petitioner's remaining arguments and Respondent's defenses.

### III.    Respondent's Affirmative Defenses

If a petitioner establishes by a preponderance of the evidence that a respondent wrongfully removed and/or retained the children from their habitual residence, the children must be returned unless the respondent can establish one of the Convention's narrow affirmative defenses.  *Sealed Appellant*, 394 F.3d at 343 (citation omitted).  Although the Court has already determined that Petitioner failed to satisfy his burden to demonstrate that the children were

---

[20] The Parties disagree on where the new residence of the children was intended to be located; however, they agree that there were multiple possibilities.  Respondent testified that she did not intend to ever return to Venezuela, and could not do so for the safety of herself and her children, but that she and Petitioner had discussed being reunited in the future as a family in Spain if Petitioner sought and was able to find a job there. [Pet. Ex. 2; TR (Respondent) at 42:4-24, 45:13-46:4]. Petitioner agreed that Spain was a possibility for their eventual relocation, but also testified that they were considering other possibilities, such as Panama, Ecuador, and Venezuela. [TR (Petitioner) at 60:1-61:16; TR (Respondent) at 5:22-6:1, 11:12-12:14].  It appears as though there was no shared parental intent as to where the new habitual residence of the children would be located – whether that be in the United States, Spain, Panama, or Ecuador.  Notwithstanding, it is clear that given the conduct of the Parties prior to their departure that there was no intent for the children to return to Venezuela.  Moreover, the Parties agreed prior to their travel to move the children to the United States to seek political asylum, at least in the interim while Petitioner and Respondent developed a plan for their future.  *See Levesque v. Levesque*, 816 F. Supp. 662 (D. Kan. 1993) (finding that parents mutually agreed that both mother and child would return to Germany for an undetermined period of time with father's consent and this was sufficient to demonstrate an intention to alter the child's habitual residence).  This matter remains unsettled; however, the Court finds that the last shared parental intent between the Parties was to abandon the children's habitual residence in Venezuela with the intent to relocate that residence elsewhere. *Berezowsky*, 765 F.3d at 468.

[21] Even if the Court was found to have erred in its determination that Petitioner failed to establish that Venezuela was the habitual residence of the children, this error is harmless as the Court finds the consent exception to return applies here.  *See Velasquez v. Green*, No. 4:12cv66, 2012 WL 2885662, at *6 (E.D. Tex. July 13, 2012).

wrongfully removed and/or retained from their habitual residence, the Court will now consider those defenses asserted by Respondent.

### A. The "Well-Settled" Children Defense

When an action for return of a child is commenced more than one year after the wrongful removal and/or retention of the child and the child has become 'well-settled' in his new environment, the Court is not required to order the return of the child. *De Vasconcelos*, 2011 WL 806096, at *4 (citing CONVENTION, art. 12). The well-settled exception must be proven by Respondent by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

This action was commenced on May 22, 2015. To ascertain whether this defense is applicable, the Court must determine the date of the removal and/or retention in the United States. The children were removed from Venezuela on May 14, 2014; however, this cannot be the date of any wrongful conduct on behalf of Respondent because on this date Petitioner, Respondent, and the children traveled together to Florida to visit the United States and vacation as a family with the consent and participation of both parents.[22] The Parties continued to travel together until May 25, 2014, when Respondent and the children departed Florida for Texas to visit Respondent's sister and/or establish a residence in the United States.[23] This is the earliest possible date for any alleged wrongful removal and/or retention, and the Petitioner's petition was filed within a year of this date. CONVENTION, art. 12 (the Convention is clear that the well-settled defense is inapplicable if proceedings were commenced within one year of the wrongful removal and/or retention); *Falk v. Sinclair*, 692 F. Supp. 2d 147, 164 (D. Me. 2010) (citing *Duarte v. Bardales*, 526 F.3d 563, 569 (9th Cir. 2008) ("This one-year filing period is of particular importance under the Convention because the 'well[-]settled' affirmative defense is

---

[22][TR (Petitioner) at 22:12-14; Pet. Ex. 1 at 66-72].
[23] [TR (Petitioner) at 53:2-7; TR (Respondent) at 17:20-18:5].

only available if the petition for return was filed more than a year from wrongful removal.")); *see also Lozano v. Montoya Alvarez*, -- U.S. --, 134 S.Ct. 1224, 1236 (2014) (finding that the one-year time period for asserting this defense is not a statute of limitations and is not subject to equitable tolling).  Therefore, Respondent has not met her burden to show by a preponderance of the evidence that the Petition was filed more than a year after the wrongful removal or retention of the children, and the Court finds this defense inapplicable to the present case.

### B.  The Consent and/or Acquiescence Defense

Under Article 13(a) of the Convention, the Court is not bound to return a child if the respondent establishes by a preponderance of the evidence that the petitioner consented to or subsequently acquiesced in the removal or retention.  CONVENTION, art. 13; 22 U.S.C. § 9003. The "consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  *Larbie*, 690 F.3d at 308.  The Court will consider each defense in turn.

#### 1.  Consent

The consent defense involves the petitioner's conduct prior to the contested removal or retention from the habitual residence.  *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005).  The focus of the inquiry is the petitioner's subjective intent, as "evidenced by the petitioner's statements or conduct, which can be rather informal."  *Larbie,* 690 F.3d at 308-09 (citing *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010)).  "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country.  The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account."  *Id*. at 309 (citation omitted).

As previously discussed by the Court, the weight of the evidence reflects that Petitioner consented to the removal and/or retention of the children in the United States. Petitioner and Respondent mutually agreed to abandon the habitual residence of the children because of their fear for the children's safety in Venezuela.[24] Petitioner, Respondent, and the children then traveled together on May 14, 2014, to the United States where they intended to seek political asylum and either remain in the United States and/or travel to Spain once Petitioner was able to find suitable employment there.[25] In addition, the Parties planned for Respondent and the children to stay with Respondent's sister in Texas.[26] It is undisputed that Petitioner had knowledge of the removal and/or retention since he traveled to the United States with Respondent and the children, purchased the tickets for the family to do so, and planned with Respondent for the children to travel to Texas and remain there for an unspecified period of time. *See Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (finding that there was no consent when the abducting parent removed the child in a secretive fashion without informing the other parent). Indeed, there is no evidence that Petitioner's consent for the children to come to the United States was for a specific or limited time period.[27] Both Parties consistently testified there

---

[24] [TR (Petitioner) at 11:1-12:19, 21:16-22:11; TR (Respondent) at 5:20-6:9, 11:12-12:20, 15:10-15, 45:2-15; Pet. Ex. 2 at 1; Pet. Ex. 8 at 7:14-9:6].

[25] [TR (Petitioner) 7:23-8:2, 10:7-14; TR (Respondent) at 17:14-17; Pet. Ex. 1 at 42:4-10, 66-72].

[26] [TR (Petitioner) at 10:7-14, 53:2-10, 79:9-12; TR (Respondent) at 17:20-18:5].

[27] A pivotal issue in this case is whether the trip to the United States was intended to be permanent or merely for a summer visit with family. The Third Circuit in *Baxter* considered a similar circumstance to the one faced by this Court. 423 F.3d at 371-72. In *Baxter,* the petitioner acknowledged that he consented to his wife and child traveling to the United States for a short period of time to allow him and his wife to plan a new course. *Id.* at 366. Conversely, the respondent insisted that the trip was, in fact, a permanent relocation. *Id.* The Third Circuit – after a fact intensive inquiry – found that the petitioner in *Baxter* had not consented. *Id.* at 372-73. The Third Circuit's decision hinged, in large part, on the clearly limited nature of the petitioner's consent both in scope and duration. *Id.* Here, unlike *Baxter*, Petitioner and Respondent shared a mutual intent to abandon Venezuela in favor of relocating to another country. [TR (Petitioner) at 10:7-14, 11:19-21, 13:25-14:16, 53:2-10, 79:9-12; TR (Respondent) at 16:20-25, 17:1-4, 17:20-18:5, 18:21-19:7, 45:2-10, 42:4-24, 45:2-15, 45:19-46:4; Pet. Ex. 1 at 69; Pet. Ex. 2]. And there is no evidence that either Petitioner or Respondent expected the trip/relocation to the United States to be of a temporary or very limited duration. The record is, in fact, replete with evidence that there was no end date. After considering all the facts at issue in this case, the Court finds that Petitioner consented to the removal and/or retention of the children in the United States, and the return of the children to Venezuela is not warranted.

was no end date.[28]  Further, on June 30, 2014, Petitioner told Respondent that he wanted both children to learn English within one year without losing their Spanish, implying that Petitioner expected Respondent and the children to remain in the United States for at least another year.[29] So while Petitioner testified at some points his ultimate intent was not for the children to stay permanently, it is unlikely that the children's stay was intended to be of limited duration when weighed against Petitioner's prior conduct.  In addition to Petitioner's failure to show there was a date planned for the children's return, he has also failed to show/present any evidence that he was taking any steps to prepare for the children's return, such as enrolling the children in school in Venezuela – in fact, the opposite is true. [30]  *See Munoz v. Ramirez*, 923 F. Supp. 2d 931, 957-58 (W.D. Tex. 2013) (the court held that there was no evidence of consent where the petitioner intended for the child to travel to the United States for a final summer visit with the respondent, planned to enroll the child in school in Mexico on August 22, 2011, and agreed to a fixed return date of August 22, 2011).

Most courts agree that conduct after removal can further indicate whether the petitioning parent actually consented at the time of the removal or retention, and ample case law indicates that a later change of heart or regret over such consent does not effect the consent.  *See Nicolson*, 605 F.3d at 105 (consent can be proved successfully with relatively informal statements or conduct); *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001).  The Ninth Circuit has opined that a petitioner cannot rescind or revoke consent because that argument would conflate "ex ante consent and ex post acquiescence when either alone extinguishes a right of return under the Hague Convention."  *Gonzalez-Caballero v. Mena*, 251 F.3d at 794.

---

[28][TR (Petitioner) at 10:7-14, 53:2-10, 79:9-12; TR (Respondent) at 17:20-18:5].
[29] [TR (Respondent) at 24:8-9, 25:1-16].
[30] [TR (Respondent) at 13:14-14:6].

Many of the same factors that led the Ninth Circuit in *Gonzalez* to find consent also exist here. First, there was no evidence that the non-removing parent (Petitioner) objected to the child becoming a United States citizen. *Id*. at 793. Here, the family traveled to the United States on six-month tourist visas, but no flights were purchase for Respondent and the children to return during this time. Upon arrival, Petitioner met with the immigration consultant, agreed for Respondent and the children to pursue political asylum in the United States, and supported Respondent's asylum application for her and the children.[31] Also, as in *Gonzalez*, there was no testimony that the child's visit was intended to be brief, temporary, or for a specific, limited period of time; rather Respondent, with the knowledge, consent, and participation of Petitioner, brought all of the children's paperwork to the United States, enrolled them in school, and actively pursued asylum. *Id*. As of June 2014, Petitioner evidenced an intent for Respondent and the children to remain in the United States for at least a year from that date to continue to learn English.[32] Further, Petitioner continued to provide financial support through December of 2014 at a bank account he had set up in Frisco, sent Respondent and the children clothes for winter, and initially planned to return to the United States in late 2014 to visit his children.[33] Each of the aforementioned facts weighs in favor of consent, and the Court finds that the informal conduct/acts of Petitioner lead to the conclusion that Petitioner consented to the removal and/or retention of the children in the United States.

### 2. *Acquiescence*

---

[31] [TR (Petitioner) at 10:7-14, 11:16-18, 53:2-10, 54:24-55:4, 58:20-59:1, 79:9-12; TR (Respondent) at 14:11-21, 17:20-18:5, 20:13-25].
[32] [TR (Respondent) at 24:8-9, 25:1-16].
[33] [Pet. Ex. 7; TR (Petitioner) at 18:14-20, 71:7-23; TR (Respondent) at 37:1-3].

Acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. *Baxter*, 423 F.3d at 371 (citing *Gonzalez-Caballero,* 251 F.3d at 794). "[T]he defense of acquiescence has been held to require 'an act or statement with requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'" *Id.* (citing *Friedrich*, 78 F.3d at 1070). The acquiescence inquiry turns on the subjective intent of the parent who is claimed to have acquiesced. *Id.* (citations omitted).

Respondent has not met her burden to demonstrate that Petitioner acquiesced to the retention of the children in the United States. Respondent asserts that Petitioner's conduct over a significant period of time shows that he acquiesced to the children's removal and/or retention; however, Petitioner contends that he requested the return of the children in September of 2014, and these proceedings were filed in May of 2015. This is not a sufficient period of time, and there is no statement with the requisite formality in this case. Respondent asserts that the power of attorney signed by Petitioner is sufficient to satisfy this inquiry, but the Court disagrees. *See Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1358-59 (M.D. Fla. 2002) (finding that a broad Authorization to Travel, which allowed the children to travel freely, did not indicate that the parent gave up his legal rights of custody and was not sufficient to prove acquiescence); *Nicolson*, 605 F.3d at 108-09 (finding that a father's assent to an order issued in the U.S. after the child's arrival that granted temporary parental rights and responsibilities to the mother did not amount to acquiescence because it was not a clear and unequivocal renunciation of parental rights by the father). The power of attorney is a legal document that gives Respondent the authority to make medical, educational, and other decisions regarding the children while in the United States without their father. However, such a document specifically retains, and does not

waive the custody rights of Petitioner and expressly limits the time frame for which the power of attorney is valid.[34]   The purpose of the power of attorney was to secure Respondent and the children's application for asylum, and lacks the requisite formality required by this defense.  For these reasons, the Court finds that Petitioner did not acquiesce to the removal and/or retention of the children in the United States.

## C.  The Grave Risk of Physical and/or Psychological Harm Defense[35]

The Court need not order the return of the children if Respondent shows by clear and convincing evidence that there is a "grave risk that [their] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." CONVENTION, art. 13(b); 22 U.S.C. § 9003(e)(2)(A).  "A grave risk of harm can be established when return of the child to the country of habitual residence puts the child in 'immediate danger prior to resolution' of the underlying custody dispute.'"  *Gallardo v. Orozco*, 954 F. Supp. 2d 555 (W.D. Tex. 2013).  "The grave risk exception is to be narrowly construed."  *Taylor v. Hunt*, No. 4:12CV530, 2013 WL 620934, at *8 (E.D. Tex. Jan. 11, 2013) (citing *England*, 234 F.3d at 270-71).

 "[A] grave risk or intolerable situation exists where return of the child would send the child to a zone of war, famine, or disease, or in cases of serious abuse or neglect."  *Id.* (citing *Vazquez v. Estrada*, 2011 WL 196164, at *5 (N.D. Tex. 2011) (finding no grave risk exception

---

[34] [Pet. Ex. 4].

[35] Of note is that the pendency of an asylum application has no bearing on the ultimate outcome of the proceedings in this Court, because there is no authority to indicate that "a grant of asylum confers a right to remain in the country despite judicial orders under this Convention [and] the asylum grant does not supersede the enforceability of a district court's order that the children should be returned to their mother, as that order does not affect the responsibilities of either the Attorney General or Secretary of Homeland Security under the [Immigration and Nationality Act]."  *Sanchez v. R.G.L.,* 761 F.3d 495, 509-11 (5th Cir. 2014).  Moreover, the evidentiary frameworks of an asylum proceeding and this proceeding are different.  *Id*.  A grant of an asylum application is relevant, however, to whether the Convention's consent and grave risk exception should apply. *Id.*  There may be significant overlap between an asylum inquiry and the grave risk defense, because both focus on the level of harm to which the children would be exposed if returned to their home country.  *Id.*  In the present case, the asylum applications are still pending.

because of the "spiraling violence and surge in murders in Monterrey" and because of "specific violent acts that have been committed in the school [the child] attended in Monterrey and in the neighborhood where Petitioner resides.")).  Due to this high standard, findings of grave risk are rare.  *See, e.g., England*, 234 F.3d at 271 (finding that the alleged "grave risk of psychological harm if [the child] should be separated from [the abducting parent]" is "inapposite to the 'grave risk' determination" under the guidance of other Hague Convention cases); *Gallardo*, 954 F. Supp. 2d at 576 (holding that unsupported allegations of petitioner's prostitution "fall extremely short of reaching the high threshold necessary to establish the grave risk of harm affirmative defense."); *Taylor*, 2013 WL 620934, at *8 (holding undisputed evidence that Petitioner "would leave [the child] with other adults… for extended periods of time in order to work as a dancer" did not rise to the level of grave risk); *Edoho*, 2010 WL 3257480, at *6 (finding that respondent failed to meet burden on grave risk defense when there was conflicting testimony regarding abuse of the child).

### 1. *Grave Risk of Physical Harm*

Respondent contends that returning the children to Venezuela would place them at grave risk or in an intolerable situation because Venezuela is not safe for the children.  Specifically, Respondent testified that she, as well as members of her immediate family, were involved in anti-government protests and/or a military coup against the Venezuelan government. Respondent alleges that her name appears on a "black list" sponsored by the Venezuelan government called the Tascón, which contains the names of those persons who protested against the current government.[36] Respondent argues that her uncle, father, and sister no longer reside in Venezuela for this reason, and some of her family members have already been granted and/or

---

[36] [TR (Respondent) at 9:6-13, 9:22-10:5].

pursuing political asylum in the United States.[37] Moreover, Respondent testified that, on March 4, 2014, she and her children were threatened in Venezuela when she was asked to pass a message to her uncle and father to "stop messing with the government."[38] At the conclusion of the conversation, the men who threatened her said, "Okay, you have a beautiful blondies [children], then take care."[39] Respondent interpreted this as a threat against her and her children.

Respondent must show by clear and convincing evidence that returning the children to Venezuela would subject them to a grave risk or otherwise place them in an intolerable situation, and the Court finds that she has failed to meet this burden here. There are no allegations of abuse by either parent. Further, there is hardly evidence that returning the children to Venezuela is tantamount to returning them to a zone of war, famine, or disease. In *Vazquez v. Estrada*, No. 3:10-cv-2519, 2011 WL 196164, at *5 (N.D. Tex. Jan 19, 2011), the court concluded that violent activity in the city, such as a surge of murders and violent acts committed in the neighborhood where the children resided, was not sufficient to qualify as a "zone of war" because it was a risk of general violence which was not specific to the children. *See also Silverman v. Silverman*, 338 F.3d 886, 901 (8th Cir. 2003) (concluding that general regional violence was not sufficient for zone of war because suicide bombers threatened everyone in Israel and not specifically the children). Moreover, the alleged threat against Respondent's children could be interpreted various ways and in any event such threat was made more specifically against Respondent's uncle, father, and Respondent herself for their anti-government activities. Because none of these "anti-government" individuals currently reside in Venezuela at this time, the Court finds that it doesn't rise to the necessary standard for grave risk. Accordingly, Respondent has failed to show by clear and convincing evidence that the children should not be returned because doing so

---

[37] [TR (Respondent) at 8:4-16].
[38] [TR (Respondent) at 10:6-11:11].
[39] [TR (Respondent) at 10:16-22].

would subject them to a grave risk of physical harm or otherwise place them in an intolerable situation.

### 2. *Grave Risk of Psychological Harm*

A court may also determine that return of the children is not warranted if returning them will expose them to a grave risk of psychological harm. For example, in *Blondin v. Dubois*, 238 F.3d 153, 163 (2d Cir. 2001), the Second Circuit found, based on expert testimony, that a child would undoubtedly have post-traumatic stress disorder if he was returned to his habitual residence, which constituted a grave risk of psychological harm to the child. Similarly, in *Ermini v. Vittori*, 758 F.3d 153, 166 (2d Cir. 2014), the Second Circuit considered evidence that a child with autism faced a grave risk of psychological harm if removed from his current therapy and returned to Italy, his country of habitual residence. The court found that: (1) significant psychological harm to the autistic child would occur because the child would regress in his skills and would not develop cognitive, language, social, emotional, and living skills that he would through the program available in the United States; and (2) the harm was of a severe magnitude because the autistic child would lose the ability to develop skills for an independent life without his current therapy. *Id*. at 166-67.

In the present case, J.A.L.O. is an autistic child who is described as being high-functioning.[40] J.A.L.O. currently receives special education services at Frisco ISD, which includes speech therapy, occupational therapy, and behavioral therapy.[41] J.A.L.O. is represented to be doing very well in school, and has progressed rapidly since beginning there in June of 2014.[42] Ms. Fletcher is J.A.L.O's special education teacher at Frisco, ISD, and she testified that

---

[40] [Pet. Ex. 1 at 93-112; Pet. Ex. 8 at 26:18-27:2; TR (Petitioner) at 48:3-11; TR (Respondent) at 46:7-8, 63:12-14].
[41] [Pet. Ex. 8 at 55:18-23].
[42] [Res. Ex. 4].

when he first arrived, J.A.L.O. was fearful and anxious.[43]  She observed a significant speech delay, as well as a number of behavior problems.[44]  However, J.A.L.O. has improved significantly over the last school year, and is catching up to his grade level expectations for a high-functioning autistic individual.[45]  The Frisco ISD teachers and administrators testified that they feared that if J.A.L.O. were to return to Venezuela that he would experience a regression in his abilities and in the progress he made since arriving in the United States.

While the Court agrees that J.A.L.O. may be likely to experience some regression in his progress if he were to return to Venezuela, the Court finds that fact is not sufficient to constitute a grave risk of psychological harm to J.A.L.O.  As an initial matter, J.A.L.O. was receiving services for speech therapy, occupational therapy, and behavioral therapy while in Venezuela.[46]  There is no evidence that these therapies were insufficient or otherwise inadequate, only that the services offered in the United States are perceived to be better.  In *Ermini*, the Second Circuit, in an issue of first impression, found a grave risk of psychological harm existed to an autistic child whose parents brought the child to the United States from Italy for the purpose of seeking appropriate treatment.  758 F.3d at 157.  The Second Circuit found that, if removed from his educational program and not placed in an analogous program; the child faced a severe loss of skills – including his ability to develop cognitive, linguistic, social, and emotional skills – and would likely never lead an independent life.  *Id*. at 166.  Relying on expert testimony, the Second Circuit noted that the probability that he would cease to develop independent living skills and significantly regress was near certainty, and further found that no similar treatment program was available in Italy.  *Id*.  The *Ermini* court was faced with more severe facts than those presented

---

[43] [*Id*.].
[44] [*Id*.].
[45] [*Id*.].
[46] [TR (Respondent) at 28:8-29:18, 64:7-25, 65:11-17].

in the present case. Here, J.A.L.O. is high-functioning; J.A.L.O.'s educators testified that it was "likely," not certain, that he would regress if returned to Venezuela and all testified they had absolutely no knowledge of the availability of and/or lack of services in Venezuela. Based on the record evidence submitted by Petitioner, there are comparable therapies available for J.A.L.O. in Venezuela, and, in fact, J.A.L.O. was receiving treatments while living there [Dkt. 1]. Similarly, there was no testimony that J.A.L.O. would not be able to develop critical independent living skills in the future if returned to Venezuela. For these reasons, the Court finds that Respondent has not met her burden to show by clear and convincing evidence that there is a grave risk of psychological harm[47] to J.A.L.O. if he is returned to Venezuela.

### D. The Public Policy Defense

A court may refuse to return a child if a respondent proves, by clear and convincing evidence, that doing so would violate fundamental principles relating to the protection of human rights and fundamental freedoms. *Sabogal v. Velarde*, No. TDC-15-0448, 2015 WL 2452702, at *19 (D. Md. May 20, 2015); *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va 2002), *aff'd*, 52 F. App'x 207 (4th Cir. 2002). "This seldom-cited and somewhat obscure provision was adopted as a compromise between those countries that wanted a public policy exception in the Convention and those that did not." *Hazbun Escaf*, 200 F. Supp. 2d at 614. The "public policy" exception applies when the "return of a child would utterly shock the conscience of the court or offend all notions of due process." *Id*. The Parties have not cited, nor has the Court found, any authority applying this exception to the return of a child. Moreover, there is no

---

[47] "[T]he focus of a court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it typically is in a state custody case; rather it is the specific claims and defenses under the Convention, namely whether a child has been wrongfully removed to, or retained in, a country different from the child's habitual residence and, if so, whether any of the Convention's defenses apply to bar the child's return to his habitual residence." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va 2002), *aff'd*, 52 F. App'x 207 (4th Cir. 2002).

evidence in the record sufficient to establish the clear and convincing threshold of this defense. Thus, the public policy defense is inapplicable here.[48]

### *Conclusion*

The Court's role in this matter is very limited. The Court is not tasked with determining Petitioner's custody rights as to J.A.L.O. and D.A.L.O., only whether they were wrongfully removed and/or retained from Venezuela in the United States. *See* 22 U.S.C. § 9001. Questions regarding custody, Petitioner or Respondent's alleged wrongful conduct, or the best interests of the children are a matter for another court, and not the undersigned. Because the court finds that Petitioner failed to satisfy his burden to show that there was wrongful removal and/or retention here, and the Respondent proved by a preponderance of the evidence that Petitioner consented to the removal and/or retention of the children in the United States, the Court finds that Petitioner's Verified Petition Under Hague Convention for Return of Abducted Children [Dkt. 1] is hereby **DENIED**, and this matter should be closed on the Court's docket.

The Court further finds that Petitioner and Respondent should each bear their own legal fees, costs, and travel expenses, except as the Parties have otherwise agreed.

---

[48] Respondent in essence conceded at the time of trial that she was aware she could not establish this defense [Res. Closing Argument].

Finally, while the Court finds that J.A.L.O. and D.A.L.O.'s return to Venezuela is not warranted, its findings herein should not be construed as a finding that Petitioner should be prevented from seeing or forming a relationship with his sons. It is clear to the Court that both parents love and care for their children, and the Court encourages both Petitioner and Respondent to act in a manner that will facilitate both Parties having a relationship with their children.

**IT IS SO ORDERED.**

**SIGNED this 28th day of August, 2015.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE